IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JESSICA DAVIS,<br><br>Defendant. | Criminal Nos.  05-122<br><br>**SENTENCING MEMORANDUM FOR DEFENDANT JESSICA DAVIS**<br><br>Date:          October 4, 2012<br>Time:          2:30 p.m.<br>(Honorable Richard J. Leon) |

NOW COMES the Defendant Jessica Davis, by and through her counsel-of-record James D. Henderson, and files this memorandum relating to her sentencing currently scheduled for October 4, 2012, at the hour of 2:30 p.m. before the Honorable Richard J. Leon, United States District Judge.

## I.    INTRODUCTION/BACKGROUND

During 2007, the World Trade Organization ("WTO") Compliance Panel ruled that the United States had not brought its federal gambling laws into full compliance with an earlier WTO appellate ruling in which litigation in the U.S. had been an active litigant.  The underlying litigation stemmed from a dispute between

the governments of Antigua and Barbuda ("Antigua") and the United States regarding internet gambling and the treaty known as the General Agreement on Trade in Services ("GATS") to which both countries were signatories. Antigua had initiated the litigation in view of that country's proactive and aggressive encouragement to various individuals and entities involved in internet and telephone gaming that such activities were both legal and of considerable benefit to the economy of that jurisdiction. Hundreds of individuals became employed, received health benefits, and the tax base of Antigua was increased substantially thereby significantly boosting its troubled economy. It was the U.S. indictment/investigation of a number of the encouraged entities and individuals and the resultant further harm to the economy of Antigua and Barbuda which thereafter led to that country's successful GATS violation litigation against the United States. As is often prudent to a losing party in litigated matters, the United States has been engaged with Antigua in attempting to resolve both the amount of the arguable substantial damages due to Antigua and to fairly bring to an end the criminal indictments which had been brought against Antiguan entities and their operators. The present matter before this court is among the several cases which have been a portion of the lengthy and still ongoing settlement discussions between the United States and Antigua. Following a number of meetings between representatives of the two countries, a conceptual disposition in this matter was ultimately reached and was finalized by the individual counsel for each defendant.

On June 22, 2012, the Defendant Jessica Davis entered a plea of guilty to three counts of money laundering in indictment number 05-cr-122 and one count of

conspiracy to violate the Wire Wager Act in indictment number 12-cr-049.[1]  More specifically, the two indictments charge that during relevant time periods Jessica Davis was involved in the day-to-day operations of an Antiguan based gaming company known as World Wide Telesports ("WWTS") while knowing that the company was accepting wagers and payouts for losing wagers from individuals located in the United States.  Further, Ms. Davis was aware that various payouts received from losing bettors were used to continue and promote the WWTS gambling business.

## II.    THE PLEA AGREEMENT

The defendant's pleas were entered pursuant to a written plea agreement currently on file with the court.  While setting forth a factual basis for the pleas, the agreement contains a stipulated literal Guidelines calculation of an offense level of 12.  This literal calculation results from Sentencing Guidelines §§ 2E3.1(a)(2) and 2S1.1(a)(2) (relating to gambling offenses and gambling related money laundering, i.e. the negotiation of individual bettors' checks), and § 3E1.1(a) (acceptance of responsibility).[2]  The plea agreement further provides, in numbered Section 7 entitled "Court Not Bound by the Non-Mandatory Sentencing Guidelines," that the defendant may seek a sentence outside the Guidelines range and should she do so, "the government will not object."

---

[1] This indictment was originally brought in the Southern District of New York (No. 04 CR 851) but has been transferred to the District of Columbia pursuant to Rule 20 of the Federal Rules of Criminal Procedure.  The New York indictment and the Washington D.C. indictment are both founded upon the interrelated gambling activities of the same business during the same time period.

[2] No role enhancement pursuant to Guidelines § 3B1.1(b) or (c) was deemed here appropriate because despite Ms. Davis being listed as a WWTS officer, such was done merely for purposes of allowing her to handle routine banking matters as requested by Antiguan banking institutions.  Ms. Davis, it is not disputed, was essentially the secretary to the WWTS owner, acted only pursuant to his instructions, and was a salaried employee with no independent authority and no equity in the company.

III.   **THE PRESENTENCE REPORT AND OBJECTION THERETO**

The presentence report was received in September, 2012.  While this defendant maintains no objections to the factual recitations contained in the report, such recitations are occasionally supplemented throughout this filing in order to bring various additionally relevant facts to the attention of the court.  The presentence does, however, compute an offense level slightly different from that agreed on by the parties.  According to the report, the defendant's final offense level is a 14.  The report reaches this level by utilizing a total of the individual bettors' negotiated checks (some $66,000) received by WWTS as set out in the overt acts section of Count 1 of the Washington D.C. indictment.  This count is a money laundering conspiracy charge.  It is noteworthy, however, that the defendant did not enter a plea to this count.  Her plea was only to counts 3-5 which are the substantive counts containing transactions amounting to but a few hundred dollars. The problems with the presentence report computation appear to be several.  First, Ms. Davis was a mere paid employee at WWTS whose role was to follow the directions of those above her.  Even with a sophisticated analysis of WWTS and corresponding bank records, it is probably not possible to determine just what checks this defendant actually assisted in cashing or negotiating.  She clearly was uninvolved with the totality of the checks as such were more often handled by co-defendant William Scott, office worker Gwen Salmon, those in the accounting department, or any one of the dozens of telephone clerks also employed at WWTS. Second, it is impossible from the Count 1 overt acts to determine if any of the listed transfers were merely the result of William Scott's personally handled wagering which he thereafter funneled through the business but were not necessarily business related.  Further, the round figures set out in the overt acts section of Count 1 appear to be primarily <u>pre-bet</u> transfers/deposits which may or may not have been actually utilized to later place illicit wagers.  Funds which were

not actually bet should not be included in a fair money laundering calculation. Such funds, when not actually utilized for wagering, were routinely returned to bettors. In summary, at this point in time, it is virtually impossible to accurately calculate the precise amount of laundered funds involved or the amount for which this defendant could, in fairness, be held responsible. A correct figure is clearly below $66,000 and to simply quantify the figure in the manner done by the presentence report raises unnecessary issues pursuant to <u>United States v. Booker</u>, 543 U.S. 220 (2005).[3] The negotiated plea agreement here attempts to reach a fair result in view of the role of Ms. Davis, the nature of her violations, their historical occurrence, and the combination of equities attendant to this prosecution.[4]

## IV.   <u>18 U.S.C. § 3553</u>

The evolution of the law relating to sentencing since <u>United States v. Booker</u>, 543 U.S. 220 (2005), has made clear that courts should not employ a presumption that the non-mandatory Federal Sentencing Guidelines range for a defendant is a reasonable or appropriate sentence,[5] and "extraordinary circumstances are not needed to justify a sentence outside the Guidelines range."[6] Instead, the Guidelines are but one of many factors for the court to consider when imposing a sentence and "3553(a)(3) directs sentencing courts to consider sentences other than imprisonment."[7] The task for the court is to impose a

---

[3] According to <u>Booker</u>, at pages 863-64, "[t]his Court has repeatedly held that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury . . . and established beyond a reasonable doubt, not merely by a preponderance of the evidence."

[4] Attached hereto as Exhibit "A" is a copy of the correspondence to the Washington D.C. United States Probation Office further addressing the defendant's objection to the computation of the presentence report's offense level.

[5] <u>See</u> United States v. Gall, 552 U.S. 38, 49-50 (2007), and United States v. Rita, 127 S.Ct. 2456, 2465 (2007).

[6] United States v. Gall, 552 U.S. 38, 47 (2007), and United States v. Ruff, 535 F.3d 999, 1002 (9th Cir. 2008).

[7] United States v. Gall, 552 U.S. 38, 50 (2007).

reasonable sentence, based on the individual defendant and the facts and circumstances of the particular case at hand that is "sufficient but not greater than necessary"[8] to achieve the statutory purposes of sentencing.

## V.    THE ROLE OF MS. DAVIS AND PERSONS AT WWTS

Jessica Davis is a 42-year-old divorced woman and the sole custodian and financial support of a 13-year-old daughter named "Silka." Ms. Davis resides in Willemstad, Curacao, where she is legitimately employed full time while her ex-husband resides in Antigua where the defendant worked at the time of the violations before the court. Other than less than one-half of their daughter's yearly English school tuition of some $23,000, the ex-husband is not a contributor to Silka's child support. The defendant has no prior criminal history, and has never even experimented with drugs. From 1997 until 2002, she was the secretary/assistant to the co-defendant in the instant case; one William Scott. Mr. Scott was the sole owner of WWTS which company was licensed and legitimate under Antiguan law. Ms. Davis' responsibilities, in addition to normal clerical tasks such as paying William's Scott's phone bills, credit card bills, car payments, rent payments, and the like, included working with Antiguan authorities and regulators and assisting the Antiguan government with revisions of its licensing legislation and regulations. As noted above, such activities were completely legal under the laws of Antigua and actually encouraged by that country. Ms. Davis was never a WWTS owner, operator, investor, or shareholder, nor was she involved in accepting wagers, setting the "line" or odds for wagers, or directing the transfer of funds from the U.S. to Antigua. It is estimated that while Ms. Davis was employed at WWTS, approximately 65% of all revenues of WWTS was from non-U.S. bettors; mostly from Taiwan and other Asian countries. On January 22, 2003,

---

[8] 18 U.S.C. § 3553(a).

WWTS was sold to an Australian publicly traded corporation listed on the Australian Stock Exchange (Betcorp), and William Scott retired from the business of gambling. Ms. Davis was retained by Betcorp due to her dealings with the Antiguan government until she resigned in June 2006.

In November 2006, Ms. Davis began working for Pinnacle Sports Worldwide in Curacao where she is currently in charge of developing the Asian market. In December of 2006 when she began at Pinnacle, she sought a legal opinion from Virginia/Washington D.C. attorney Juan Chardiet, who deals extensively in gaming matters, on the issue of the legality of internet gaming following the passage of the Uniform Internet Gaming Enforcement Act ("UIGEA"). The legal opinion advised that Pinnacle should immediately cease doing business with all U.S. based customers in both sports wagering and in online casinos. Substantially due to Ms. Davis' insistence, the management and directors of Pinnacle ceased doing business with all U.S. customers in January 2007. Ms. Davis is well recognized as the instrumental factor in implementing stringent procedures to preclude any U.S. customers from being able to bet at Pinnacle. This policy remains in effect to the present day.

## VI.    **RESTITUTION/FINE**

There is no restitution obligation in the instant case. Page 14 of the presentence report recites this defendant's net worth as merely $19,000 when excluding the $70,000 equity in her modest home. Her monthly expenses are $5,838, and her gross monthly income (before taxes) is $9,100 less deductions of approximately $900. The outstanding mortgage on the defendant's residence is $350,000. At page 17 of the report it is noted that the offense level guidelines fine

range in this case, pursuant to § 5E1.2(c)(3), is $3,000 to $30,000.[9]  Acceptance of the stipulated plea agreement guidelines calculation sets the fine range at the same figures.  As the court well knows, pursuant to Guidelines § 5E1.2(a), the court may waive a fine when a defendant cannot reasonably pay one or where a fine may unduly burden dependents.  Such appears to be the case here in view of Ms. Davis' child rearing responsibilities in a foreign country without substantial assistance from the child's father who resides in another jurisdiction.  Based on the above, it is respectfully requested that the court waive any fine as to this defendant. Numbered paragraph 75 at page 16 of the presentence report concurs with this request and specifically notes that a fine in this case is not recommended.

## VII.  CONCLUSION

The role of Jessica Davis in WWTS was minimal one.  The company owner, co-defendant William Scott, himself characterizes Ms. Davis as no more than his secretary.  Ms. Davis was paid a modest salary for her employment at WWTS as well as for the handling of Mr. Scott's family finances.  She had no equity interest whatever in WWTS or any interest in profits.  She has no criminal record, has never even experimented with drugs, is a devoted mother and the sole provider for a 13-year-old daughter, and has taken affirmative steps to avoid the behavior which has brought her before this court.  Her present employer identifies her as an outstanding employee and an incredibly hard worker.  Those who know her best describe her as "a woman of integrity and honor," "hard working, dedicated, and honest," "an outstanding human being," "a very spiritual person," and "a decent, diligent, and trustworthy individual."  See attached Exhibit "B."  Ms. Davis' contrition appears genuine and, as illustrated by the conditions under which she

---

[9] 18 U.S.C. § 1956 does allow for a fine in money laundering cases in excess of $30,000.  Where, as here, the defendant's plea is to substantive money laundering charges totaling less than $1,000, such would not appear to constitute an equitable disposition.

became employed at her present company (Pinnacle), the risk of recidivism seems basically non-existent.  In fact, the behavior which brings her before the court took place some 10 years in the past and she has not experienced legal problems in more than a decade.  Accordingly, the likelihood that she would successfully complete a period of probation/supervised release appears extremely high.  It is believed that the Government is not in disagreement and, as noted above, the prosecution has previously stated in the plea agreement that, should such be requested, it did not oppose a sentence of probation.  It is believed that this remains the Government's position.

Based on all the above, it is respectfully submitted that a sentence of probation/supervised release is an appropriate one.  It is further requested that Ms. Davis be allowed to serve such a sentence in the country of Curacao where she presently resides, is the situs of her residence, and the location where she is raising her young daughter who has just begun her first year of high school.

Respectfully submitted,

Dated:  September 27, 2012     LAW OFFICES OF JAMES D. HENDERSON


By:  s/ James D. Henderson
     JAMES D. HENDERSON
     2530 Wilshire Boulevard, Second Floor
     Santa Monica, California 90403
     Telephone:  310-264-1898
     Facsimile:  310-264-4755
     email:     jdhjunior@aol.com
     CA State Bar:    104150

# Exhibit A

## LAW OFFICES OF JAMES D. HENDERSON
### 2530 Wilshire Boulevard
### Second Floor
### Santa Monica, CA 90403

----------------------------------------------------------------

Telephone: (310) 264-1898
Facsimile:   (310) 264-4755

September 18, 2012

VIA E-MAIL:
Sherry_Brandon@dcp.uscourts.gov

Ms. Sherry Brandon
United States Probation Office
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Suite 2214
Washington, D.C. 20001-2866

Re:    <u>U.S. v. Jessica Davis</u>

Dear Ms. Brandon:

I have received and reviewed the presentence report relating to my client Jessica Davis. The only issue relates to your computation of the defendant's offense level.

As you know, the plea agreement in this case calculates a total offense level of 12 as well as the Government's rather specific representation that it will not be opposing a non-Guidelines sentence (i.e. probation or its equivalent) should such be sought at the time of sentencing. The plea agreement, as you might imagine, was subject to considerable negotiation and precludes the defendant from arguing for Guidelines adjustments which may have considerable merit such as a downward departure based on the defendant's role, that the Guidelines overstates the seriousness of the defendant's conduct because the money laundering is really no more than part of the underlying gambling conduct and the defendant was merely a salaried employee whose awareness of any possible illegality vis-à-vis the gambling was extremely minute. Further, the plea was specifically to only Counts 3-5, not to transactions totaling $65,978 which you apparently extrapolated from the conspiracy count. Ms. Davis' plea in the Washington, D.C. indictment/money laundering case was not to the Count 1 conspiracy. The conspiracy count to which Ms. Davis entered a plea was from the New York <u>gambling</u> case which is merely a transmission of gambling information case.

In addition, assuming <u>arguendo</u> that the concept of your calculation is the one most appropriate in this case, I note the following: § 2S1.1(a) and (b) provides for two separate calculations for a base offense level. The paragraphs are to be applied in order, that is, if (a) applies it must be applied, and if it does not apply, then (b) is the default. The defense and

Ms. Sherry Brandon
September 18, 2012
Page 2

the Government stipulated to the use of (b).  Probation has also used (b).  As can be seen, use of § 2S1.1(b) invites the application of the graduated fraud table in § 2B1.1.  This allows for an increase in the base offense level commensurate with the amount of money laundered. Here, Probation has settled on $66,000.  This provides for a six level increase to the base offense level from 8 to 14.  Add to that the two level increase for a conviction under 18 U.S.C. § 1956 and the result is an offense level calculation of 16.  A reduction of three levels for acceptance of responsibility under § 3E1.1 would leave Ms. Davis at a level 13.  I believe this to be the essence of your calculation.

To the contrary, however, there is a highly credible argument that § 2S1.1(a) could be applied.  This would be more in line with the bottom line intention of the parties if the existing plea agreement stipulation is not to be accepted.  Using the section, the base offense level is derived from the base offense level of the underlying offense if the defendant is responsible for the underlying conduct.  Here Ms. Davis had admitted legal responsibility for the underlying conduct in the statement of the offense which she has signed and submitted to the court.  Thus, it appears to be proper to apply § 2S1.1(a) which results in a base offense level of 12 for a violation of 18 U.S.C. § 1084.  With two offense levels added for the § 1956 conviction and applying the acceptance of responsibility reduction, Ms. Davis would be left with an offense level of 12, but without any dispute over the fraud table.  This, of course, means that there may be at least three ways to compute this defendant's offense level.

All this being said, I appreciate your hard work on the presentence report and your repeated courtesy and professionalism.  It has not escaped me that despite the complexities of figuring the offense level calculations, numbered paragraph 102 of the presentence report states that in this case "the Court should consider whether a variance, a non guideline sentence, under 18 U.S.C. § 3553 is warranted."  As you have obviously surmised, this is the view of both the defense and the prosecution in this cause and I will be setting forth the supporting reasons in the defendant's sentencing memorandum.  Thanks again for your efforts.

Very truly yours,

James D. Henderson
Attorney for Jessica Davis

# Exhibit B

July 24, 2012

Honorable Richard J. Leon
United States District Judge
Washington, D.C.

Dear Sir:

We are writing this letter to attest to the character of my daughter, Jessica Davis-Dyett. Due to circumstances beyond our control, we have had a very difficult time visiting and being able to see our daughter for the past 16 years. Jessica was a great girl growing up, with her main interests in school being her family, her friends and basketball.

Our daughter was brought up in a very patriotic family. Because of this, Jessica has a tremendous belief in God and Country. We have strived to instill in her, honesty and integrity, and know that she has lived up to our expectations.

Jessica has demonstrated, to us and her friends, the loyalty and love with which we have raised her.

She is a wonderful mother to her 13-year-old daughter Silka, who is her #1 priority in her life.

Thank you for your consideration.

Sincerely yours,

JOHN E. DAVIS, JR.

HANNELORE E. DAVIS



31st July, 20
Honourable Richard J. Leon.
United States District Judge
Washington D.C.


Your Honour,

My name is Shirlene A. Nibbs, a management consultant based on the island of Antigua, where I have been a resident and citizen for all my life.  I am widely recognized for my accomplishments in tourism especially the top notch customer service training that Nibbs & Associates my company has a reputation for providing. I am also well known for reaching out to my community through my presentations, and mentoring of others.

Jessica Davis is one of the most genuine, hard working and caring individuals that I have ever come across. I have known her for over 15 years and our relationship has been nothing but a positive one. Jessica is a woman of integrity and honour and places a high premium on the human resources she is entrusted to lead. She is one, who not only takes her job seriously and does it to the best of her ability, but also has an immense amount of love for her family, friends and staff, a quality that I experience is sometimes lacking my community.  I have had numerous occasions to interact with Jessica and her friends and daughter.  I have indicated to her what I admire most is the great job she has done in raising her daughter who has very good manners, is considerate and generous to her playmates.

In reference to community, Jessica has adopted the Caribbean and its people as her second home, and has made significant contribution towards the growth and development of her adopted home. As one of the leading figures in her industry in the Caribbean, her business prowess has provided numerous employment and advancement opportunities for many within our region.

Sincerely Yours


*(signature)*

# THE BIRD LAW FIRM, INC.

Attorneys-at-Law & Notaries Public
Milburn House, Old Parham Road, P O Box 2735, St John's, Antigua, West Indies

CLEMENT E. M. BIRD
LL.B (HONS) (LW G) F C
DIRECTOR

*Your Reference*

*Our Reference*

Honorable Mr. Justice Richard J. Leon                              1ˢᵗ August 2012
United States District Judge
Washington
District of Columbia
United States of America

Dear Sir

**Re:     Ms. Jessica Davis**

Ms. Davis has been known to me personally and professionally over the past fifteen (15) years. I have at all times found her a decent, diligent and trustworthy individual in all her personal business dealings conducted via and or utilizing the services of our firm. I would unhesitatingly refer her to all.

In her professional avocations, it has been clear to the undersigned that she has gained the respect of her peers, as well as those whom she has supervised or managed along the way, and within the wider Antigua and Barbuda society as well. I have often admired her ability to maintain a professional and courteous attitude to all, regardless of rank or station.

On a personal level, I consider Ms. Davis a friend, our families having often interacted on a social level. She is a caring, nay, 'doting' mother. As a divorcee, she has raised her daughter Silka in a truly commendable and exemplary manner.

Yours sincerely

...................................
CLEMENT E. M. BIRD

To Whom It May Concern:                                          July 28, 2012

It is difficult to decide where to start with this letter for Jessica Davis, my friend since we were babies. How do you put the character of one's life who you have known intimately for over 40 years into a letter? To convey to people who have never met her what an outstanding human being she is.

Jessica's values come first and foremost from her family. A family that has provided leadership not only in the small farming community of McClusky, North Dakota, but also in the State of North Dakota and the United States. Jessica's grandfather, John Edward Davis was the Governor of North Dakota. Jessica learned from her family to be humble, to care and treat others with respect and kindness, to value people, and to be a person of virtue who others can follow.

Secondly, Jessica's character comes from her childhood community. One that taught Jessica to work hard, pull together, look out for one another, and to support those around you. As a child, Jessica chose to spend her time working hard at the skill of basketball. It paid off as she grew up to become a leader on the court with her skills, drive, passion and engaging personality. She touched lives in a positive manner throughout the basketball community in the state of North Dakota and later in South Dakota during her college years. While playing college basketball, she worked hard at academics, often times doing extra academic work.

As a young adult, I observed Jessica working many hours for her internship and at her job while living in Antigua, West Indies. She is a hard worker, with a lot of drive. She takes pride in the work that she produces. In Antigua she met Billy, a man several years her senior, and went to work for him. She worked many, many hours and looked to him for guidance and leadership in the new career that she started in her early 20's. Jessica is a woman with integrity. Over the years as I listened to her story unfold she was unaware of breaking the law. Once she was aware she had to wait approximately thirteen years for Billy to address the legal issues. During this time of not being able to enter the United States where her parents, siblings, relatives, friends, supports and community are, she made the best of her situation. She started a family, continued to work hard, to give to the people and community of Antigua, and make it her home.

She has suffered a great deal of consequences in the past several years. First and foremost she was never able to travel with her daughter to the United States. She had to trust others with her daughter, so that her daughter could fly to the United States to meet her family and to learn where her mother came from. Second of all, she had to be strong, independent and raise her daughter in a country other than her own and without any family support. Last but not least, she has been separated from her family, friends and community for an extended amount of time. These separations have been very difficult for Jessica. I do believe that over the years through her experiences, Jessica has learned much about her business, her career and area of expertise. There is no chance that she will ever be found in any illegal activity again.

Respectfully,

Kerri Klein

30 July 2012

Honorable Richard J. Leon
United States District Judge
Washington D.C.

Your Honor,

I have had the pleasure of knowing Jessica Davis for the past 19 years. We first met in Antigua back in 1993. I was relaxing on my day off and she and her Uncle were walking her dog. I had been living there for about a year and she had just moved to the island a few months before. It was one of those encounters that you just know that this was a friendship in the making.

Over the years I have had the opportunity to experience Jessica in two different capacities. I have had the great pleasure to work with her as well as be her friend. She has a way of bringing the best out in a person whether it being someone who works with her or someone she considers a friend. Her heart is always on her sleeve and she is always willing to help and support people. She has a heart of gold!

As a co-worker she is hard-working, dedicated, honest and loyal to her job. She motivates people to do their best and to accomplish their goals. She is someone that co-workers look up to and admire because of her professionalism.

I have never seen anyone keep and maintain friendships like Jessica can. She had a birthday a few years ago and four of her college friends came to the islands to celebrate with her. Those long time friends put their daily lives on hold to fly down and celebrate a special birthday with her. They told me that "nothing could keep them from celebrating this milestone birthday with Jessica."

She is a person that is always there to listen to your problems and give advice if you want to accept it. She is a very spiritual person and counts her blessings everyday (Believe me, I have heard her!). I am a very fortunate person to have Jessica as a close friend as she has changed my life with the help of her guidance. I am not sure I would be in the place I am in my life if it were not for my friendship with Jessica. She has supported me in my hard times and gave me that shoulder to cry on as well as celebrated with me during the great times!

Jessica gave birth to her daughter seven months after I had my daughter. The kids have been friends all their lives. They have gotten closer as friends in the last few years, maybe because they are getting older and can understand the appreciation of great friendships; like my friendship with Jessica. Being a parent has definitely change Jessica in a positive way. She has always been understanding and compassionate to others but when she became a parent that all multiplied. Her daughter, Silka, absolutely adores her mother. I

have seen the transformation that Jessica has been through during her journey of motherhood. Silka is her number one priority in life.

Jessica has always been willing to assist different organizations that are in need. She has been on the PTA of her daughters' school and is always willing to donate what she can, whether monetary or her personal time. Jessica supports her daughter 100% in anything she does. We have sat on the sidelines of many soccer games cheering on our daughters.

Jessica has been through a lot over the years but she has always maintained a positive attitude; which I admire. She is a great role model for her daughter as well as others. She is a great friend and someone I am blessed to have in my life

I trust that the information provided will be of help and assistance.

If you have any further questions, please do not hesitate to call me on +5999-566-7582

Sincerely,

Nancy Knapman